[Nos. D040186, D040866. Fourth Dist., Div. One. Jan. 28, 2004.]

AGNES BERNARDO et al., Plaintiffs and Appellants, v.
PLANNED PARENTHOOD FEDERATION OF AMERICA et al.,
Defendants and Respondents.

## COUNSEL

Fagan & Fagan, Stuart E. Fagan; Thomas More Law Center, Patrick T. Gillen and John Kindley for Plaintiffs and Appellants.

James E. McElroy and Dara Klassel for Defendants and Respondents.

## OPINION

**NARES, Acting P. J.**—Agnes Bernardo, Pamela Colip and Saundra Duffy-Hawkins (collectively, Bernardo) brought suit for injunctive relief against Planned Parenthood Federation of America (PPFA) and Planned Parenthood of San Diego and Riverside Counties (PPSDRC) (together Planned Parenthood) under California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.) and false advertising law (Bus. & Prof. Code, § 17500 et seq.). Bernardo alleged that PPFA's and PPSDRC's Internet Web sites (<http://www.plannedparenthood.org.html> and <http://www.planned.org.html>, respectively) contained "unlawful, unfair,

confusing, and misleading statements/advertisements" that caused women to make critical health care decisions without full, complete, and accurate information about (1) the safety of abortion, (2) the safety of abortion vis-à-vis childbirth, and (3) the scientific/medical literature that Bernardo claims establishes a link between induced abortion and breast cancer (hereafter sometimes referred to as the ABC link).

Bernardo sought two types of injunctive relief: (1) an injunction restraining Planned Parenthood from publishing its statements that abortion is safe or safer than childbirth and its position that the weight of credible medical research has failed to establish a link between induced abortion and breast cancer; and (2) a mandatory injunction requiring Planned Parenthood to provide to all of its former and prospective abortion patients information · supporting Bernardo's position that medical research has established the existence of the claimed ABC link.

Planned Parenthood filed a special motion to strike Bernardo's complaint under Code of Civil Procedure[1] section 425.16, California's anti-SLAPP (strategic lawsuits against public participation) statute (hereafter referred to as section 425.16 or the anti-SLAPP statute), which was specifically enacted to provide both a summary disposition and mandatory attorney fees and costs to prevailing defendants in such actions.[2] Planned Parenthood argued that Bernardo's action was a strategic lawsuit against public participation (SLAPP) prohibited by California's anti-SLAPP statute.

The court found that Bernardo's lawsuit was a SLAPP, granted Planned Parenthood's motion, and dismissed the action. The court awarded reasonable attorney fees to Planned Parenthood in the amount of $77,835.25 under the mandatory attorney fees provision of section 425.16, subdivision (c) (hereafter section 425.16(c)).

Bernardo has filed two appeals, which have been consolidated for purposes of disposition. In case No. D040186, Bernardo appeals the court's order dismissing her action as a SLAPP under section 425.16. Bernardo contends that Planned Parenthood's Web site statements constitute commercial speech that may properly be regulated under Business and Professions Code sections 7200 and 17500 and that the court erred when it granted Planned Parenthood's section 425.16 motion to strike because it failed to properly apply the "minimal merit" screening standard provided by the anti-SLAPP statute. In the alternative, Bernardo contends that if the court correctly applied section

---

[1] All subsequent statutory references are to the Code of Civil Procedure unless otherwise specified.

[2] *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1404 [103 Cal.Rptr.2d 174] (*Dowling*).

425.16, that statute is unconstitutional because (1) it impermissibly chills Bernardo's First Amendment right to petition the government for redress of grievances, which encompasses the right to access the courts by filing litigation, and (2) it violates Bernardo's due process rights because "the 'reasonable probability of success on the merits' standard [under section 425.16] is meaningless in practice."

In her second appeal, case No. D040866, Bernardo seeks reversal of the court's order awarding attorney fees to Planned Parenthood in the amount of $77,835.25 under section 425.16(c). Bernardo contends that section 425.16(c) is unconstitutional on its face and as applied, asserting the attorney fees award levied against her is a "fine," a "draconian penalty" or "strict liability penalty," and an "item of damages" that violates her constitutional rights to petition the government for redress of grievances and to access the courts by filing litigation, as well as her constitutional rights to due process and equal protection of the laws. We reject all of Bernardo's contentions. Accordingly, we affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *PPFA and PPSDRC*

PPFA is a national nonprofit charitable organization. According to its published mission statement, PPFA believes in "the fundamental right of each individual . . . to manage his or her fertility." It also believes in voluntary "reproductive self-determination," and preservation of an individual's right to privacy. Based on these beliefs, PPFA's mission is to (1) "provide comprehensive reproductive and complementary health care services in settings which preserve and protect the essential privacy and rights of each individual"; (2) "advocate public policies which guarantee these rights and ensure access to such services"; (3) "provide educational programs which enhance understanding of individual and social implications of human sexuality"; and (4) "promote research and the advancement of technology in reproductive health care and encourage understanding of their inherent bioethical, behavioral, and social implications."

PPFA has also published numerous policy statements indicating that it is the policy of PPFA to "assure that all individuals have the freedom to make reproductive decisions"; to promote "access to information and services related to sexuality, reproduction, methods of contraception, fertility control, and parenthood"; "ensure that women have the right to seek and obtain medically safe, legal abortions under dignified conditions and at reasonable cost"; provide "information on the nature, consequences, and risks of the [abortion] procedure, and counseling on the alternatives available to women,

so as to assure an informed and responsible decision concerning the continuation or termination of pregnancy"; "support[] a range of activities designed to reduce adolescent pregnancy and childbearing"; and "advance understanding of the interrelationship between population growth and the quality of life."

PPFA does not itself provide health care services. However, its 127 member affiliates do provide such services annually to nearly 4 million people at 875 clinics. In 1999, those clinics served communities in the District of Columbia and every state except Hawaii, North Dakota and Mississippi. The clinics (hereafter also referred to as health centers or Planned Parenthood centers) adhere to national health standards and provide comprehensive reproductive health care services, including pregnancy tests, birth control and counseling, testing and treatment for sexually transmitted infections, and breast examinations. Some of PPFA's affiliates, including PPSDRC, provide abortion services.

The Planned Parenthood centers also provide educational programs in a variety of settings, from universities and social service agencies to religious institutions and civic organizations. The programs focus on numerous topics, such as teenage pregnancy and puberty education, contraception and family planning, sexually transmitted infections, parent-child communication, women's health, and sexual orientation.

In the 1990's, PPFA reported total annual revenues of around $400 to $500 million. For the year ending June 30, 2000, total revenues were $627 million, with clinic revenue accounting for 35 percent.

B. *PPFA's Web site and "Fact Sheets"*

PPFA maintains an Internet Web site (PPFA's Web site) at <http://www.plannedparenthood.org.html>. PPFA assists the public in contacting its affiliates' health centers by providing on its Web site an interactive dialogue box in which visitors can type in their zip codes and be linked to the Web sites of the health centers closest to them. Once the visitor to PPFA's Web site has been linked to the Web site of a PPFA affiliate, such as PPSDRC, he or she may access a wide array of information on public affairs and health issues, as well as information about specific services the affiliate provides. PPFA's Web site also provides a toll-free telephone number that the Web site visitor may call to ask medical questions or to schedule an appointment with "the nearest Planned Parenthood center."

PPFA publishes on its Web site various "fact sheets" on reproductive health and public affairs issues, including four containing statements that Bernardo

sought to enjoin in this matter: (1) "Anti-choice Claims About Abortion and Breast Cancer" (the Anti-Choice Claims Web page); (2) "Choosing Abortion—Questions and Answers" (the Choosing Abortion Web page); (3) "Surgical Abortion—Questions & Answers" (the Surgical Abortion Web page); and (4) "Medical and Social Health Benefits Since Abortion Was Made Legal in the U.S." (the Medical and Social Health Benefits Web page).

PPFA's Anti-Choice Claims Web page stated PPFA's position that the ABC link is a "theory [that] has not been borne out by research," and the principal promoters of this theory oppose abortion. It also explained that "[t]he theory linking pregnancy termination and breast cancer is based on the hormonal disruption that occurs when a woman's pregnancy is interrupted. Pregnancy initiates a surge of sex hormones (estrogen, progesterone, and prolactin), which leads to differentiation of the cells in the breast glands in preparation for lactation. . . . Adherents of this theory claim that interruption of the first trimester of a first pregnancy causes a cessation of cell differentiation that may result in a subsequent increase in the risk of cancerous growth in these tissues." The Web page also explained the role of a first full-term pregnancy in reducing the long-term risk of breast cancer (hereafter the "protective effect"): "While researchers do not know what causes breast cancer, reproductive factors have been associated with risk for the disease since the 17th century, when breast cancer was noted to be more prevalent among nuns. It is known that *having a full-term pregnancy early in a woman's childbearing years is protective against breast cancer . . . .*" (Italics added.)

The Anti-Choice Claims Web page also contained a review of some of the many studies of the alleged ABC link published during the previous 20 years, including studies that support Bernardo's position that such a link exists. For example, the page stated: "In 1996, Joel [L.] Brind[, Ph.D.] and his colleagues published a meta-analysis [3] of 28 published reports describing 23 studies on induced abortion and breast cancer. Based on these studies, the authors calculated that induced abortion places women at a slightly increased risk for developing breast cancer."[4]

---

[3] The Oxford English Dictionary Online (OED Online) defines "meta-analysis" as "[a]nalysis of data from a number of independent studies of the same subject (published or unpublished), esp. in order to determine overall trends and significance." (OED Online (2003) <http://dictionary.oed.com/cgi/entry/00307098?.html> [as of Jan. 1, 2004].)

[4] In the "Works Cited" portion of the Anti-Choice Claims Web page, PPFA provided the following citation: "Brind, Joel, et al. (1996). 'Induced Abortion as an Independent Risk Factor for Breast Cancer: A Comprehensive Review and Meta-Analysis.' *Journal of Epidemiology and Community Health*, 50, 481–496."

The Web page also noted that a published 1994 study of 845 women in the State of Washington found that "among women who had been pregnant at least once, the risk of breast cancer in those who had experienced an induced abortion was 50 percent higher than among other women."[5]

The Anti-Choice Claims Web page reviewed other studies that support PPFA's position on the ABC link issue, such as a study of 1.5 million women, published in 1997 in the *New England Journal of Medicine,* which PPFA asserted found no overall connection between abortion and breast cancer.[6] It also cited a 20-year study of 49,000 women in Sweden, published in 1989, which PPFA stated found no indication of an overall risk of breast cancer after an induced abortion in the first trimester of pregnancy.[7]

PPFA's Anti-Choice Claims Web page also discussed research concerning various factors that can render a study of the ABC link unreliable and asserted that "[c]ancer researchers at the National Cancer Institute, the American Cancer Society, and major universities say that the most reliable studies show no increased risk, and they consider the entire body of research inconclusive." The Web page concluded with a "Works Cited" bibliography that cited 32 published studies on the ABC link issue, including Brind's meta-analysis and others that support Bernardo's position on the ABC link.

In its Choosing Abortion Web page, PPFA answered the question "Does abortion cause breast cancer?" by stating, "No. But abortion does not offer the same protection against breast cancer as a full term pregnancy."

On PPFA's Surgical Abortion Web page, a visitor could select the question "What are the health risks of abortion?", which would connect the visitor to another page that answered the question by stating, "In the first 20 weeks, abortion is much safer than giving birth." This statement, however, was followed by an explanation of eight "[c]omplications from early abortion," including death. PPFA stated that death "occurs in 1 of 100,000 abortions," and "[c]hildbirth carries seven times more risk."

---

[5] In the "Works Cited" portion of the Anti-Choice Claims Web page, PPFA cited: "Daling, Janet R., et al. (1994). 'Risk of Breast Cancer Among Young Women: Relationship to Induced Abortion.' *Journal of the National Cancer Institute,* 86(21), 1584–1592."

[6] In the "Works Cited" portion of the Anti-Choice Claims Web page, PPFA cited: "Melbye, Mads, et al. (1997). 'Induced Abortion and the Risk of Breast Cancer.' *New England Journal of Medicine,* 336(2), 81–85."

[7] In the "Works Cited" portion of the Anti-Choice Claims Web page, PPFA cited: "Lindefors Harris, Britt-Marie, et al. (1989). 'Risk of Cancer of the Breast after Legal Abortion during First Trimester: A Swedish Register Study.' *British Medical Journal,* 299 (December 9), 1430–1432."

Bernardo also tried to enjoin portions of PPFA's Medical and Social Health Benefits Web page. Bernardo objected to both the use of the phrase "safe, legal abortion" and the following statement: "Today, abortion is one of the most commonly performed clinical procedures, and the current death rate from abortion at all stages of gestation is 0.6 per 100,000 procedures. This is *eleven times safer than carrying a pregnancy to term* and nearly twice as safe as a penicillin injection [citations]."[8] (Italics added.)

### C.  *PPSDRC's Web site and "Fact Sheets"*

PPSDRC's Internet Web site (PPSDRC's Web site) is found at <http://www.planned.org.html>. Like PPFA, PPSDRC publishes various Web site pages that address reproductive health and public affairs issues, including some that Bernardo tried to suppress in this matter. For example, PPSDRC's Web site contained a fact sheet titled "Abortion Info: Q&A: Future [Pregnancies]" (the Abortion Info Web page), which answered the question "Does abortion cause breast cancer?" by stating, "No, but abortion does not offer the protection against breast cancer that having several full-term pregnancies does."

### D.  *Terms of Use of Planned Parenthood's Web Sites*

Both PPFA and PPSDRC included in their Web sites a terms-of-use page notifying Web site visitors that Planned Parenthood provided the Web sites subject to the visitors' "agreement to comply with the Terms of Use." Each terms-of-use page informed visitors that the information provided on the Web sites was for the visitors' personal education only and that nothing on the Web sites constituted a recommendation for medical care. Each page also advised visitors to "[a]rm yourself with good information about sexual and reproductive health maintenance, and *visit a qualified health care provider for personal medical evaluation, counseling, and services*." (Italics added.)

### E.  *Bernardo's SLAPP Complaint*

In August 2001, Bernardo filed her SLAPP complaint for injunctive relief against Planned Parenthood under California's unfair competition law (Bus. & Prof. Code, § 17200 et seq., hereafter the UCL) and false advertising law

---

[8] PPFA cited the following two studies listed in the "Cited References" section at the end of the Medical and Social Health Benefits Web page: (1) "Paul, Maureen, et al. (1999). *A Clinician's Guide to Medical and Surgical Abortion.* New York: Churchill Livingstone"; and (2) "Gold, Rachel Benson. (1990). *Abortion and Women's Health: A Turning Point for America?* New York: The Alan Guttmacher Institute."

(Bus. & Prof. Code, § 17500 et seq., hereafter the FAL). Bernardo alleged that PPFA and PPSDRC's Internet Web sites contained "unlawful, unfair, confusing, and misleading statements/advertisements" that caused women to make critical health care decisions without full, complete, and accurate information about the safety of abortion, the safety of abortion vis-à-vis childbirth, and the "scientific/medical literature" that Bernardo believed established the existence of the ABC link.

### 1. *Injunctive relief requested*

In her complaint, Bernardo sought an injunction restraining Planned Parenthood from publishing statements that abortion is safe or safer than childbirth and that the weight of credible medical research has failed to establish a link between induced abortion and breast cancer. In effect, Bernardo's action thus sought to enjoin portions of PPFA's Anti-Choice Claims, Choosing Abortion, Surgical Abortion and Medical and Social Health Benefits Web pages, as well as PPSDRC's Abortion Info Web page (all of which are discussed, *ante*).

Bernardo also sought a mandatory injunction requiring Planned Parenthood to provide to all of its former and prospective abortion patients a series of statements drafted by Bernardo and her counsel that support Bernardo's view that medical research has established the existence of the claimed ABC link.[9]

---

[9] Bernardo requested an injunction "restraining [Planned Parenthood and its] agents from performing abortions and abortion-related services unless they first provide the following information prior to scheduling, and/or accepting any payment for, abortions or abortion-related services to be rendered in California: [¶] A large body of published medical research implicates induced abortion as a cause of breast cancer in two ways. [¶] First, abortion does not offer the protection against breast cancer provided by a first full-term pregnancy before age 30. Therefore, having an abortion results in a higher risk of getting breast cancer later in life than carrying the pregnancy to term for women under age 30 who have not yet had a full-term pregnancy. [¶] Second, having an abortion increases a wom[a]n's risk of breast cancer even more than the risk is increased by delaying a first full-term pregnancy. Evidence of this additional increased breast cancer risk has been observed in most epidemiological studies in American women. There is also evidence of an even larger increase in breast cancer risk among women who have an induced abortion while a teenager, and among women who have both a family history of breast cancer and an induced abortion."

Bernardo also requested an injunction "requiring [Planned Parenthood] to provide all of their patients who received an induced abortion in California with a notice of the increased risk of breast cancer described herein so that these patients are aware of their increased risk and can seek appropriate medical monitoring and treatment. *The notice should read as follows*: [¶] Our records show that you received an abortion at our clinic. We are sending you this notice to inform you that a large body of published medical research implicates induced abortion as a cause of breast cancer in two ways. [¶] First, abortion does not offer the protection against breast cancer provided by a first full-term pregnancy before age 30. Therefore, having an abortion results in a higher risk of getting breast cancer later in life than carrying the pregnancy to term for women under age 30 who have not yet had a full-term pregnancy. [¶]

## 2.  *Brind's affidavit*

In support of these allegations, Bernardo attached to her complaint an affidavit of Joel L. Brind, Ph.D. (Brind), a professor of biology in the Department of Natural Sciences of Baruch College of the City University of New York, and the author of a paper titled *Induced Abortion as an Independent Risk Factor for Breast Cancer: A Comprehensive Review and Meta-Analysis* (hereafter Brind's meta-analysis),[10] which was published in 1996 in the British Medical Association's Journal of Epidemiology and Community Health.

In his affidavit, Brind stated that of 36 independent studies published worldwide that presented specific data on induced abortion and the incidence of breast cancer, 17 had reported a statistically significant increase in the risk of breast cancer overall among women who have one or more induced abortions, and 10 had reported a risk increase that did not achieve statistical significance. He also stated that three of the 36 studies reported no tendency for increased or decreased risk, three reported a decrease in risk that did not achieve statistical significance, and three reported a statistically significant decrease in risk. He explained that, as he discussed in his 1996 meta-analysis, when he compiled the data for all 36 studies, using either a weighted or unweighted average, he calculated that "the risk of breast cancer among those women who had experienced an induced abortion was 30 [percent] higher than among women who had not, independently of the effect due to abortion's delay of first full-term pregnancy," and since the lifetime risk of breast cancer for an average American woman is between 10 and 12 percent, this 30 percent increase "amounts in absolute terms to at least a three percent, or 3 in 100, excess risk of developing breast cancer."

Brind also opined in his affidavit that PPFA's Anti-Choice Claims Web page is "a thoroughly biased and misleading presentation of the scientific literature on this subject," which "creates the untrue and/or misleading

---

Second, having an abortion increases a woman's risk of breast cancer even more than the risk is increased by delaying a first full-term pregnancy. Evidence of this additional increased breast cancer risk has been observed in most epidemiological studies in American women. As of June 2001, 17 independent studies in the worldwide literature have substantiated the theory that induced abortion increases breast cancer risk by reporting positive associations with statistical significance, a technical term meaning at least 95 [percent] certainty that the association between induced abortion and increased risk of breast cancer is not due to chance. There is also evidence of an even larger increase in breast cancer risk among women who have an induced abortion while a teenager, and among women who have both a family history of breast cancer and an induced abortion. [¶] If you have had an abortion you should be aware of this increased risk of breast cancer and seek appropriate medical screening and care. For more information about these studies addressing the link between induced abortion and breast cancer please contact your physician."

[10] The definition of the term "meta-analysis" is set forth in footnote 3, *ante.*

impression that the preponderance of the scientific analysis supports the assertion that there is no link between induced abortion and increased risk of breast cancer." He challenged numerous specific statements contained in the Anti-Choice Claims Web page.

Brind opined that Planned Parenthood's answer of "No" to the question "Does abortion cause breast cancer?" was "untrue and/or misleading, because the overwhelming preponderance of the evidence indicates that abortion does cause breast cancer, both by removing the protection against breast cancer to be gained by completing the pregnancy already in progress, and by increasing the risk of breast cancer independently of the loss of this protective effect." He also opined that the Planned Parenthood Web site statements he challenged were "likely to mislead reasonable members of the public as to the safety of abortion, the safety of abortion vis-à-vis childbirth, and the link between induced abortion and breast cancer."

F.  *Planned Parenthood's Special Motion To Strike Under the Anti-SLAPP Statute*

Planned Parenthood filed a special motion under the anti-SLAPP statute to strike Bernardo's complaint. Planned Parenthood argued that the complaint was a meritless SLAPP intended to use California's consumer protection statutes (Bus. & Prof. Code, §§ 17200 et seq. & 17500 et seq.) to thwart Planned Parenthood from exercising its constitutional right to speak about abortion; stop it from "providing free information on the [W]orld [W]ide [W]eb regarding abortion, an issue of great public concern, and on the related issue of breast cancer and abortion"; force it to adopt Bernardo's view of medicine on Planned Parenthood's own Web sites and tell women that abortion causes breast cancer; and "frighten women into refraining from exercising a constitutional right to reproductive choice" based on "very questionable science" and Bernardo's "anti-abortion agenda."

Planned Parenthood also argued that Bernardo could not meet her burden under the anti-SLAPP statute (section 425.16, subd. (b)(1), hereafter § 425.16(b)(1))[11] of showing a probability that she would prevail on any of her claims because (1) Planned Parenthood advised all visitors to its Web sites in the terms of use (discussed, *ante*) that the health information provided on the Web sites was for the visitors' personal education only; (2) the information did not concern any product or service within the meaning of the

---

[11] Section 425.16(b)(1) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

UCL, nor did it concern or advertise any product or service within the meaning of the FAL, and thus did not fall within the ambit of these consumer protection statutes; and (3) even if it did, the Web site health information was supported by ample peer-reviewed scientific studies as shown by the supporting expert declarations of four health professionals.

In support of the motion to strike, Planned Parenthood submitted the declarations of David B. Preskill, M.D., the Chief of Service for Obstetrics and Gynecology at Southern California Kaiser Permanente in San Diego; Georgia Robbins Sadler, Ph.D., Associate Clinical Professor of Surgery at the University of California, San Diego (UCSD) School of Medicine, and the Associate Director for Outreach at the UCSD Cancer Center; Steven R. Drosman, M.D., the former Chief of the Obstetrics and Gynecology Section of Sharp Memorial Hospital and currently the Chief of Staff for Sharp Mary Birch Hospital for Women at Sharp Memorial Hospital, and Polly A. Newcomb, Ph.D., who is a member of the Fred Hutchinson Cancer Research Center in Seattle, Washington, a professor of epidemiology at the University of Washington School of Public Health, and an associate editor who provides editorial service to 18 peer-review epidemiology journals, including the New England Journal of Medicine and the American Journal of Epidemiology.

Planned Parenthood filed a written request that the court take judicial notice of the fact that abortion is one of the most controversial political issues in our nation.

Bernardo opposed the special motion to strike, asserting that this case is not about the right to abortion. Bernardo contended the motion should be denied on two main grounds: (1) Planned Parenthood's speech was false and misleading, such speech was not entitled to legal protection, and thus Planned Parenthood had failed to make the requisite prima facie showing that they were engaged in protected activity within the meaning of section 425.16; and (2) Bernardo was able to make a prima facie showing of a probability of succeeding on the merits because Planned Parenthood Web site statements were made in connection with their offer of abortion services so as to constitute advertising within the meaning of the UCL and FAL, and Bernardo had "all but conclusive evidence" that those statements misled the public about the safety of abortion, the safety of abortion vis-à-vis childbirth, and the evidence showing that induced abortion increases the risk of breast cancer.

In support of her opposition, Bernardo submitted the declarations of all three individual appellants; Brind's declaration; and the declaration of five medical doctors, "one from each medical specialty required to address the increased risk of breast cancer caused by induced abortion over the life of the

woman," who all opined that induced abortion causes increased risk of breast cancer: Elizabeth Shadigian, M.D., a board certified obstetrician/gynecologist engaged in clinical practice and teaching at the University of Michigan School of Medicine; Jane Anderson, M.D., a board certified pediatrician teaching at the University of California, San Francisco; Chris Kahlenborn, M.D., a board certified physician of internal medicine engaged in clinical practice and epidemiological research who has published on the ABC link; Jose Bufill, M.D. (Bufill), who studied medicine at the University of Navarre in Spain, and is practicing oncology and hematology and teaching at the Indiana University School of Medicine; and Angela Lanfranchi, M.D., a surgeon specializing in breast surgery and a clinical professor at Robert Wood Johnson Medical School.

### G. Order Granting Planned Parenthood's Anti-SLAPP Motion To Strike

The court granted Planned Parenthood's motion to strike Bernardo's complaint under the anti-SLAPP statute on the ground that Bernardo had failed to show the requisite probability of prevailing on the merits of the complaint and obtaining the injunctive relief she sought. Specifically, the court found that the challenged statements in Planned Parenthood's Web pages "[could not] be construed as pure commercial speech or pure advertisement" and, even if they could be so construed, Bernardo had failed to present sufficient evidence to show a probability of prevailing on the UCL and FAL claims that Planned Parenthood's Web site statements were unlawful, that they constituted an unfair or fraudulent business practice, and that they also constituted false or deceptive advertising. The court noted that contrary to Bernardo's argument that Planned Parenthood's Web sites were deceptive by failing to recognize the "protective effect" against breast cancer that a full-term pregnancy provides, Bernardo had acknowledged Planned Parenthood's statement (in the Choosing Abortion and Abortion Info Web pages) that "abortion does not offer the same protection against breast cancer as a full term pregnancy." The court also noted Bernardo's allegation that Planned Parenthood had made a false statement of fact by claiming that abortion is safer than childbirth, but found that this allegation was centered on Bernardo's position that abortion causes breast cancer and that her own evidence showed there were two "camps of thought" and an "on-going debate in the scientific community" on the issue of whether there is link between induced abortion and breast cancer. The court further found that Planned Parenthood had not failed to disclose (in its Anti-Choice Claims Web page) that numerous studies supported Bernardo's position that induced abortions increase a woman's risk of breast cancer. In appeal No. D040186, Bernardo has appealed the order granting Planned Parenthood's section 425.16 motion to strike.

H.  *Order Awarding Attorney Fees to Planned Parenthood*

Planned Parenthood brought a motion for a mandatory award of attorney fees under section 425.16(c) in the amount of $77,835.25. Bernardo opposed the motion, claiming the lawsuit was not a "sham"; that Planned Parenthood was seeking an improper enhancement on a contingency fee basis that would punish Bernardo's counsel in violation of his due process rights to notice; and that an award of fees under section 425.16(c) would violate Bernardo's rights under the United States and California Constitutions to petition the government for redress of grievances and exercise free speech in connection with a public issue, as well as Bernardo's due process right to meaningful notice as to when mandatory costs and fees will be levied, and the guarantee of equal protection in that section 425.16(c) "functions as a content-based penalty for certain suits and creates an invidious distinction between classes of litigants and causes which is not narrowly tailored to achieve any compelling governmental interest."

The court issued an order granting the attorney fees motion and awarding attorney fees to Planned Parenthood in the sum of $77,835.25. In appeal No. D040866, Bernardo has appealed that order.

DISCUSSION

I.

BERNARDO'S APPEAL FROM THE ORDER
GRANTING PLANNED PARENTHOOD'S MOTION TO
STRIKE THE COMPLAINT UNDER THE ANTI-SLAPP
STATUTE

For reasons we shall explain, we independently conclude that Planned Parenthood was entitled to a judgment of dismissal under the anti-SLAPP statute because in opposing Planned Parenthood's motion to strike under section 425.16, Bernardo failed to state and substantiate a legally sufficient claim and thus failed to meet her statutory burden of showing a reasonable probability of prevailing on the claims for injunctive relief asserted in her complaint.

A.  *Standard of Review*

"We review the trial court's rulings on a SLAPP motion independently under a de novo standard of review." (*Kajima Engineering & Consruction., Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 929 [116 Cal.Rptr.2d 187].)

### B. Overview of Section 425.16

In *Dowling, supra,* 85 Cal.App.4th at page 1414, this court explained that "[a] SLAPP lawsuit is generally defined as a 'meritless suit filed primarily to chill the defendant's exercise of First Amendment rights.' [Citation.] SLAPP suits 'are brought, not to vindicate a legal right, but rather to interfere with the defendant's ability to pursue his or her interests. Characteristically, the SLAPP suit lacks merit; it will achieve its objective if it depletes defendant's resources or energy. The aim is not to win the lawsuit but to detract the defendant from his or her objective, which is adverse to the plaintiff. [Citation.]' [Citation.]"

As we also observed in *Dowling,* "[s]ection 425.16 was enacted in 1992 to deter and prevent SLAPP suits, and is 'designed to protect citizens in the exercise of their First Amendment constitutional rights of free speech and petition.' [Citation.] The anti-SLAPP statute 'is California's response to the problems created by meritless lawsuits brought to harass those who have exercised these rights.' [Citation.] 'California enacted section 425.16 to provide a procedural remedy to resolve such a suit expeditiously.' [Citation.]" (*Dowling, supra,* 85 Cal.App.4th at p. 1414, italics omitted.)

The Legislature expressly set forth the intent and purpose underlying the anti-SLAPP statute in section 425.16, subdivision (a), which provides: " The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly."

We further explained in *Dowling* that " 'the common features of SLAPP suits are their lack of merit and chilling of defendants' valid exercise of free speech and the right to petition the government for a redress of grievances.' [Citation.] 'Section 425.16 was intended to address those features by providing a fast and inexpensive unmasking and dismissal of SLAPP's. [Citations.]' [Citation.]" (*Dowling, supra,* 85 Cal.App.4th at pp. 1414–1415.)

#### 1. Special motion to strike SLAPP suits

"[Section 425.16(b)(1)] authorizes a special motion to strike a SLAPP suit, and expressly makes subject to such a motion '[a] cause of action against a person *arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution*

*in connection with a public issue* . . . , unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.' " (*Dowling, supra,* 85 Cal.App.4th at p. 1415, italics added by *Dowling.*)

In *Dowling,* we noted that "[s]ubdivision (e) of section 425.16 expressly defines the First Amendment activity from which a cause of action must arise within the meaning of section 425.16[(b)(1)] . . . in order to be the proper subject of a special motion to strike under the anti-SLAPP statute. [Citation.] Subdivision (e), as amended in 1997, provides that the phrase ' "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue," ' as used in section 425.16, includes four categories of conduct, which are separately defined in the subdivision's four clauses: [¶] 1) '[A]ny written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law' (§ 425.16, subd. (e)(1)); [¶] 2) '[A]ny written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law' (§ 425.16, subd. (e)(2)); [¶] 3) '[A]ny written or oral statement or writing made in a place open to the public or a public forum *in connection with an issue of public interest*' (§ 425.16, subd. (e)(3) [italics added by *Dowling*]); or [¶] 4) '[A]ny other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest' (§ 425.16, subd. (e)(4))." (*Dowling, supra,* 85 Cal.App.4th at pp. 1415–1416, fn. omitted.)

### a. *Burdens of proof*

In *Navellier v. Sletten* (2002) 29 Cal.4th 82 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*), the California Supreme Court explained the two-step process that a court must follow in determining whether an action is a SLAPP within the meaning of section 425.16. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§ 425.16[(b)(1)].) 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)' [citation]. If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (§ 425.16[(b)(1)]; see generally *Equilon Enterprises v. Consumer Cause. Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685] [(*Equilon*)].)" (*Navellier, supra,* 29 Cal.4th at p. 88.)

The *Navellier* court also explained that "in order to establish the requisite probability of prevailing (§ 425.16[(b)(1)]), the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citation.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.] [¶] Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier, supra,* 29 Cal.4th at pp. 88–89.)

"In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) "[T]hough the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].)

## C. *Analysis*

The record shows Bernardo did not and cannot meet her statutory burden under the anti-SLAPP statute of showing a reasonable probability of prevailing on the merits of her claims for injunctive relief because (1) Bernardo's own evidence shows that Planned Parenthood's challenged statements about the claimed ABC link were expressions of opinion about an issue of genuine scientific debate, and those statements were noncommercial speech fully protected under the First Amendment to the United States Constitution and not actionable under either the UCL or FAL; (2) Bernardo's challenge to Planned Parenthood's statements regarding the safety of abortion failed as a matter of law because her own evidence showed that this challenge was based on the unsupported premise that the claimed ABC link was an established scientific fact; and (3) were we to assume Planned Parenthood's Web site statements were commercial speech that consisted of or were based on statements of fact, not opinion, Bernardo failed to show a reasonable probability of prevailing on the merits of her claims that the statements were unlawful, unfair or fraudulent within the meaning of Business and Professions Code section 17200 or constituted false advertising within the meaning of Business and Professions Code section 17500. We reject Bernardo's contentions that the court improperly weighed the evidence and improperly applied section 425.16 in violation of Bernardo's constitutional rights.

1. *The challenged statements are fully protected noncommercial speech*

Bernardo cannot show a probability of prevailing on the merits of her claims because her own evidence shows Planned Parenthood's challenged speech regarding the central disputed issue of whether induced abortion causes breast cancer was noncommercial speech entitled to full First Amendment protection, and thus was not actionable under Business and Professions Code sections 17200 or 17500.

Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." (*United States v. United Foods, Inc.* (2001) 533 U.S. 405, 409 [150 L.Ed.2d 438, 121 S.Ct. 2334], citing *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976) 425 U.S. 748, 762 [48 L.Ed.2d 346, 96 S.Ct. 1817].) The United States Supreme Court has held that the federal Constitution "accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 64–65 [77 L.Ed.2d 469, 103 S.Ct. 2875] (*Bolger*).)

In *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 952 [119 Cal.Rptr.2d 296, 45 P.3d 243] (*Nike*), the California Supreme Court explained that "[f]or noncommercial speech entitled to full First Amendment protection, a content-based regulation is valid under the First Amendment only if it can withstand strict scrutiny, which requires that the regulation be narrowly tailored (that is, the least restrictive means) to promote a compelling government interest. [Citations.]" We note that Planned Parenthood asserts, and the record shows, that Bernardo does not claim that Planned Parenthood's speech may be regulated under Business and Professions Code sections 17200 or 17500 if it is noncommercial speech.

Here, Bernardo's own evidence in opposition to Planned Parenthood's motion to strike shows that Planned Parenthood's speech on the claimed ABC link is noncommercial speech entitled to full First Amendment protection. Bernardo's complaint alleged that PPFA and PPSDRC's Internet Web sites contained "unlawful, unfair, confusing, and misleading statements/advertisements" in violation of Business and Professions Code sections 17200 and 17500 that caused women to make critical health care decisions without full, complete, and accurate information about the safety of abortion in general, the safety of abortion vis-à-vis childbirth, and the scientific/medical literature that Bernardo claims establishes a link between induced abortion and breast cancer.

In opposing Planned Parenthood's motion to strike the complaint under the anti-SLAPP statute, Bernardo submitted photocopies of the various challenged documents that Planned Parenthood published on its Web sites: (1) PPFA's Anti-Choice Claims Web page; (2) PPFA's Choosing Abortion Web page; (3) PPFA's Surgical Abortion Web page; (4) PPFA's Medical and Social Health Benefits Web page; and (5) PPSDRC's Abortion Info Web page. On appeal, Bernardo maintains she met her burden of showing a probability of prevailing on her claim that Planned Parenthood made false statements of fact on those Web pages by claiming that abortion is safer than childbirth and that induced abortion does not cause breast cancer.

■ The evidence submitted by Bernardo shows, however, that none of Planned Parenthood's challenged Web pages proposed a commercial transaction in its contents. Rather, they were all educational in nature and asserted Planned Parenthood's positions on disputed scientific and medical issues of public interest with which Bernardo strenuously disagreed.[12] For example, PPFA's Anti-Choice Claims Web page, which addressed the claimed ABC link that was of central importance in Bernardo's action against Planned Parenthood, stated PPFA's "position" that the ABC link is "a theory [that] has not been borne out by research"; explained the ABC link "theory"; and asserted that the principal promoters of that "theory" opposed abortion.[13] The Web page also contained a review of some of the many studies of the alleged ABC link published over the previous 20 years, including some, such as Brind's meta-analysis (see fn. 4, *ante*), that support Bernardo's position that such a link exists, and others that supported PPFA's position on the ABC link issue, such as a study of 1.5 million women, published in 1997 by the New England Journal of Medicine (see fn. 6, *ante*), which, according to PPFA,

---

[12] Bernardo's own evidence confirmed Planned Parenthood's position that the claimed ABC link is the controversial subject of a genuine scientific debate. In opposition to Planned Parenthood's motion to strike, Bernardo submitted the declaration of Jose Bufill, M.D., who stated in part: "*Two schools define the scientific debate regarding the association of induced abortion with subsequent development of breast cancer.* One group argues that the weight of scientific data indicates that induced abortion places women at risk for breast cancer . . . . They offer evidence from a wide range of scientific perspectives . . . to offer a coherent, unified argument in support of a causal association. The other group . . . argues that no such association exists. The arguments they offer in support of their *opinion* center on a critique of the statistical methods used in the epidemiologic studies specifically addressing the association. . . ." (Italics added.)

[13] PPFA stated that "[t]he link between induced abortion and breast cancer is a theory whose principal promoters oppose abortion regardless of its safety. The theory has not been borne out by research." It explained the ABC link "theory": "The theory linking pregnancy termination and breast cancer is based on the hormonal disruption that occurs when a woman's pregnancy is interrupted. Pregnancy initiates a surge of sex hormones (estrogen, progesterone, and prolactin), which leads to differentiation of the cells in the breast glands in preparation for lactation. . . . Adherents of this theory claim that interruption of the first trimester of a first pregnancy causes a cessation of cell differentiation that may result in a subsequent increase in the risk of cancerous growth in these tissues."

found no overall connection between abortion and breast cancer. The Anti-Choice Claims Web page also discussed research regarding various factors that can render a study of the claimed ABC link unreliable and concluded with a "Works Cited" bibliography that cited 32 published studies on the ABC link issue, including Brind's meta-analysis and others that support Bernardo's position on the ABC link. The foregoing shows that PPFA's Anti-Choice Claims Web page was educational, not commercial, in nature.

In support of the contention that Planned Parenthood's statements are commercial speech, Bernardo points to the authenticated photocopies of Planned Parenthood's Web sites that she submitted in opposition to the motion to strike, which show (1) that on "[v]irtually every web page," PPFA provided "health info," "health centers" and "sexual health" hyperlinks that provided Web site visitors with access to sexual health information and the locations of affiliated health centers (including PPSDRC), as well as a toll-free telephone number that visitors could call to schedule an appointment; and (2) that PPSDRC's Web pages provided visitors with an opportunity to obtain payment information and clinic locations and to make an appointment. The brief text of the hyperlinks (such as "health info," "health centers" and "sexual health") on the various Web pages did not advertise or promote any services provided by clinics affiliated with Planned Parenthood. While the toll-free number provided to Web site visitors a means for scheduling an appointment for medical services, it is significant that both PPFA and PPSDRC included in their Web sites a terms-of-use page notifying visitors that Planned Parenthood was providing the Web sites subject to the visitors' "agreement to comply with the Terms of Use." Each terms-of-use page informed visitors that the information provided on Planned Parenthood's Web sites was for the visitors' *personal education*, but nothing on this site constitutes a recommendation for medical care . . . ." (Italics added.) Each page also advised visitors to "[a]rm yourself with good information about sexual and reproductive health maintenance, and visit a qualified health care provider for personal medical evaluation, counseling, and services."

■ Bernardo also relies on the fact that PPSDRC and other affiliates of PPFA provide abortion and other services from which PPFA and the affiliates derive revenue. However, any economic motivation that Planned Parenthood may have had in publishing the challenged Web site speech regarding the claimed ABC link and the safety of abortion would be insufficient by itself to turn the statements into commercial speech. In *Bolger, supra,* 463 U.S. 60, a manufacturer and distributor of contraceptives brought an action for declaratory and injunctive relief challenging a federal statute that prohibited the unsolicited mailing of contraceptive advertisements. (*Id.* at pp. 61–63.) The manufacturer decided to undertake a campaign of mailing to the public on an unsolicited basis some informational pamphlets (among other things) that not only promoted its products, but also contained discussions of important public

issues such as venereal disease and family planning. (*Id.* at pp. 62, 67–68.) The Supreme Court found that most of the manufacturer's mailings fell "within the core notion of commercial speech—'speech which does "no more than propose a commercial transaction." ' [Citations.]" (*Id.* at p. 66.) Although the *Bolger* court held that the mailings constituted commercial speech, noting that the informational pamphlets were "conceded to be advertisements" (*ibid.*), the high court explained that "the fact that [the manufacturer] ha[d] an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech. [Citations.]" (*Id.* at p. 67.) Similarly here, any "economic motivation" Planned Parenthood may have had in publishing the Web site speech that Bernardo challenges in this case would be insufficient by itself to turn the statements into commercial speech actionable under the UCL and FAL.

■ Even were we to assume that the toll-free number and Planned Parenthood's hyperlinks to information about specific clinics and services constituted commercial speech, the noncommercial speech published in the various Web pages would still receive full First Amendment protection. In *Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 9 [89 L.Ed.2d 1, 106 S.Ct. 903], the United States Supreme Court held that a utility's newsletter, which was distributed to ratepayers in the monthly billing envelopes and the contents of which ranged from political editorials to energy saving tips and billing information, "extend[ed] well beyond speech that proposes a business transaction . . . [citations], and include[d] the kind of discussion of 'matters of public concern' that the First Amendment both fully protects and implicitly encourages. [Citation.]" Under similar reasoning, Planned Parenthood's noncommercial speech in the various Web pages at issue here was fully protected under the First Amendment despite any claimed contiguous commercial speech set forth directly or indirectly in the hyperlinks or in the text accompanying the toll-free telephone number, discussed, *ante.*

Bernardo also relies on *Nike, supra,* 27 Cal.4th 939, as supporting her contention that Planned Parenthood's speech is commercial. Bernardo's reliance on *Nike,* however, is misplaced.

In *Nike,* the plaintiff, acting on behalf of the general public, brought suit under the UCL and FAL alleging that the defendant corporation, Nike, Inc. (Nike), responded to public criticism and induced consumers to continue to buy its products by making false statements of fact about its labor practices and about working conditions in factories that made its products. (*Nike, supra,* 27 Cal.4th at pp. 945, 946–947, 949–950.) Specifically, the plaintiff alleged that Nike made statements in press releases, in letters to newspapers, in a letter to university presidents and athletic directors, and in other

documents distributed for public relations purposes to the effect that workers who made Nike products were "protected from physical and sexual abuse, that they [were] paid in accordance with applicable local laws and regulations governing wages and hours, that they [were] paid on average double the applicable local minimum wage, that they received a 'living wage,' that they received free meals and health care, and that their working conditions [were] in compliance with applicable local laws and regulations governing occupational health and safety." (*Id.* at pp. 947–948.) The California Supreme Court reversed the Court of Appeal's judgment affirming the trial court's judgment of dismissal after the trial court sustained Nike's demurrer without leave to amend on the ground Nike's statements were constitutionally protected noncommercial speech. (*Id.* at pp. 948–949, 970.)

In holding that Nike's speech was commercial, the Supreme Court articulated and applied a "limited-purpose test" (the *Nike* test), stating that "*when a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception*, categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message." (*Nike, supra*, 27 Cal.4th at p. 960, original italics.) The *Nike* court explained that "[i]n typical commercial speech cases, the *speaker* is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services or someone acting on behalf of a person so engaged, and the *intended audience* is likely to be actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers." (*Ibid.*) With respect to the "content-of-the-message" element of the *Nike* test, the high court stated that "the *factual* content of the message should be *commercial in character*. In the context of regulation of false or misleading advertising, this typically means that the speech consists of *representations of fact about the business operations, products, or services of the speaker* (or the individual or company that the speaker represents), *made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services.*" (*Id.* at p. 961, italics added.) The court rephrased its *Nike* test by stating that "in relation to regulations aimed at protecting consumers from false and misleading promotional practices, *commercial speech must consist of factual representations* about the business operations, products, or services of the speaker (or the individual or company on whose behalf the speaker is speaking), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." (*Id.* at p. 962, italics added.) Thus, the three elements of the *Nike* test are (1) a commercial speaker, (2) an intended commercial audience, and (3) representations of fact of a

commercial nature. (See *id.* at p. 964.) The high court stressed that the UCL and FAL "do not suppress points of view but instead suppress false and misleading statements of fact." (*Nike, supra,* 27 Cal.4th at p. 967.)

Applying the foregoing elements of the *Nike* test to the record presented in this appeal, we conclude that Bernardo failed to show a reasonable probability of prevailing on her contention that Planned Parenthood's speech is commercial under that test. Assuming without deciding that Planned Parenthood is a commercial speaker on the ground it receives revenue from affiliated health centers, Bernardo has failed to show that Planned Parenthood's Web site statements regarding the claimed ABC link and the safety of abortion constitute representations of fact of a commercial nature within the meaning of the *Nike* test. In *Nike,* the Supreme Court held that this third element of the *Nike* test was satisfied because "[i]n describing its own labor policies, and the practices and working conditions in factories where its products are made, Nike was making *factual representations about its own business operations.*" (*Nike, supra,* 27 Cal.4th at p. 963, italics added.) The court further explained that "[i]n speaking to consumers about working conditions and labor practices in the factories where its products are made, *Nike addressed matters within its own knowledge.* The wages paid to the factories' employees, the hours they work, the way they are treated, and whether the environmental conditions under which they work violate local health and safety laws, are all matters likely to be within the personal knowledge of Nike executives, employees, or subcontractors. Thus, *Nike was in a position to readily verify the truth of any factual assertions it made on these topics.*" (*Ibid.*)

Here, however, Bernardo sought to enjoin not readily verifiable *factual* assertions about matters within Planned Parenthood's own knowledge, but Planned Parenthood's statements of *opinion* about the claimed ABC link that one of Bernardo's own experts, Bufill, conceded was the subject of "[t]wo schools" of "scientific debate." (See fn. 12, *ante*).

Bernardo does not claim, nor can she, that the claimed ABC link, a matter of genuine scientific debate, is a matter that is within Planned Parenthood's "own knowledge" within the meaning of the *Nike* test. The evidence of the Anti-Choice Claims Web page submitted by Bernardo shows that PPFA stated therein under the subheading, **"The Planned Parenthood Position is That Abortion Poses no Demonstrated Health Risks"** (original boldface), that "[t]he link between induced abortion and breast cancer is a theory" that "has not been borne out by research." The reference to Planned Parenthood's "position" indicates that Planned Parenthood was expressing its *opinion* about this disputed "theory." Bufill, in his declaration filed by Bernardo in opposition to Planned Parenthood's motion to strike the complaint under the

anti-SLAPP statute, specifically discussed the "school[]" (to which Planned Parenthood indisputably belongs) that argues there is no causal association between induced abortion and breast cancer, and stated that "[t]he arguments they offer in support of their *opinion* center on a critique of the statistical methods used in the epidemiologic studies specifically addressing the association . . . ." (Italics added.) Thus, Bernardo's expert witness evidence shows that the position taken on the ABC link issue by the school to which Planned Parenthood belongs constitutes an opinion, not a representation of fact.

■ Bernardo has also failed to show that the intended audience of Planned Parenthood's Web site speech was "likely to be actual or potential buyers or customers" of the health services of the affiliated Planned Parenthood centers. (*Nike, supra*, 27 Cal.4th at p. 960.) The record shows that Planned Parenthood's statements were published on the Internet, on Web sites accessible by the general public, and were not directed to any particular audience. Because Planned Parenthood's challenged statements about the claimed ABC link were statements of opinion to the general public about matters not within its own personal knowledge, they were not actionable under Business and Professions Code sections 17200 and 17500. (*Nike, supra*, 27 Cal.4th at pp. 962, 964.)

Bernardo has also failed to show a probability of prevailing on her claim that Planned Parenthood's speech concerning the safety of abortion constituted commercial speech that was actionable under the UCL and FAL. In her complaint Bernardo challenged (1) PPFA's statement in its Surgical Abortion Web page that "[i]n the first 20 weeks, abortion is much safer than giving birth"; (2) PPFA's statements in its Medical and Social Health Benefits Web page that "the current death rate from abortion at all stages of gestation is 0.6 per 100,000 procedures," and "[t]his is eleven times safer than carrying a pregnancy to term and nearly twice as safe as a penicillin injection"; and (3) PPSDRC's statement in its Abortion Info Web page that "abortion is about twice as safe as having your tonsils out and is safer than childbirth," and "abortion is 11 times safer than giving birth up to the 18th week of pregnancy."

On appeal, Bernardo contends her evidence shows that these statements about the safety of abortion are statements of fact, not opinion, and that they are false. This contention, however, is predicated on evidence she submitted in opposition to Planned Parenthood's motion to strike, which she maintains established that induced abortion causes breast cancer. Specifically, Bernardo asserts in her opening brief that "[Planned Parenthood's] statements of fact are false because *induced abortion does cause breast cancer and, as a result, abortion is not safer than childbirth.*" (Italics added.) Bernardo also states that "[Planned Parenthood's] comparison of mortality rates of abortion and childbirth is false and misleading because it does not factor in deaths

resulting from the abrogation of the protective effect [14] caused by termination of a pregnancy via induced abortion and resulting in breast cancer deaths."

In determining whether Bernardo has established a probability of prevailing on her claims under Business and Professions Code sections 17200 and 17500 regarding Planned Parenthood's statements about the safety of abortion, our analysis thus necessarily focuses again on Planned Parenthood's published *opinion* that credible scientific evidence has not established that induced abortion increases the risk of breast cancer. Bernardo's claim that Planned Parenthood's statements about the safety of abortion are false is based solely upon her claims that (1) the ABC link is an established scientific fact, and (2) Planned Parenthood has misrepresented the safety of abortion by failing to "factor in deaths resulting from the abrogation of the protective effect caused by termination of pregnancy via induced abortion and resulting in breast cancer deaths." However, as already discussed, Bernardo's own *evidence established that the ABC link is not an established scientific fact* because, according to one of her own expert witnesses (Bufill), it is the disputed subject of both a genuine scientific debate and of opposing opinions held by two schools (see fn. 12, *ante*). Bernardo's own evidence also shows that she belongs to the school that believes the ABC link is an established scientific fact, and Planned Parenthood belongs to the school that is of the opinion that it is not an established scientific fact.

We conclude the court properly found that Planned Parenthood's challenged Web site speech is not commercial speech because "[Planned Parenthood's] statements are not made in connection with an offer to sell abortion services, are not 'promotional' of abortion and/or do not propose a 'commercial transaction.' [Citations.] Rather, [Planned Parenthood's] statements [are] educational and/or informative in nature, as opposed to advocating and or 'advertising' (in the sense of inducing or offering a financial transaction) abortion services." Under any recognized test for commercial speech, including the *Nike* test on which Bernardo relies, Bernardo has failed to show a reasonable probability of prevailing on the merits of her claims that Planned Parenthood's challenged Web site speech is commercial or that its statements concerning the claimed ABC link and the safety of abortion are false, misleading or deceptive representations of fact that are actionable under Business and Professions Code sections 17200 and 17500.

---

[14] Bernardo attempts to define the term "protective effect" on appeal by stating in her opening brief that "[t]he role of a first full term pregnancy in reducing long term risk of breast cancer (i.e., the *'protective effect'*) is a medical fact beyond dispute as is the abrogation of the protective effect (and resulting increase in breast cancer risk) caused by the decision to abort." (Italics added.)

2.  *Assuming Planned Parenthood's statements were statements of fact, not opinion, and commercial speech, Bernardo has failed to show a reasonable probability of prevailing on her claims that the statements violated the UCL or FAL*

Even if Planned Parenthood's Web site statements were deemed to be commercial speech as representations of fact rather than expressions of opinion concerning the claimed ABC link, Bernardo's own evidence shows that she failed to establish a reasonable probability of prevailing on the merits of her claims that the statements violated Business and Professions Code sections 17200 and 17500 as alleged in her complaint.

a.  *UCL*

California's unfair competition law "prohibits unfair competition, which is defined as 'any *unlawful, unfair or fraudulent* business act or practice . . . .' ([Bus. & Prof. Code,] § 17200.) 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are *unlawful, or unfair, or fraudulent.*' [Citation.]" (*Shvarts v. Budget Group, Inc.* (2000) 81 Cal.App.4th 1153, 1157 [97 Cal.Rptr.2d 722].) Citing Business and Professions Code section 17204,[15] the Supreme Court in the *Nike* case explained that "[n]ot only public prosecutors, but also 'any person acting for the interests of . . . the general public,' may bring an action for relief under the UCL." (*Nike, supra,* 27 Cal.4th at pp. 949–950.) The *Nike* court also explained that "[u]nder this provision, a private plaintiff may bring a UCL action even when 'the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action.' [Citation.]" (*Id.* at p. 950.)

i.  *"Unlawful" business practice or act*

An "unlawful" business practice or act within the meaning of the UCL "is an act or practice, committed pursuant to business activity, that is at the same time *forbidden by law.* [Citation.]" (*Klein v. Earth Elements, Inc.* (1997) 59

---

[15] Business and Professions Code section 17204 provides: "Actions for any relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or any district attorney or by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or any city attorney of a city, or city and county, having a population in excess of 750,000, and, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor or, with the consent of the district attorney, by a city attorney in any city and county in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by *any person acting for the interests of* itself, its members or *the general public.*" (Italics added.)

Cal.App.4th 965, 969 [69 Cal.Rptr.2d 623].) The California Supreme Court has explained that "[b]y proscribing 'any unlawful' business practice, '[Business and Professions Code] section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. [Citation.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).)

Here, as the court properly found, Bernardo "failed to state which statute, regulation or law (whether federal, state or common law) [Planned Parenthood] allegedly violated." On appeal, Bernardo again fails to identify any statutory, regulatory or decisional law that Planned Parenthood allegedly violated. We thus conclude that Bernardo failed to meet her burden of stating and substantiating a legally sufficient claim of unlawfulness. (*Navellier, supra,* 29 Cal.4th at p. 88.)

### ii.   *"Unfair" business practice or act*

The court noted that "[w]ith regard to the definition of 'unfair' under the UCL . . . the law is unclear as to which definition of 'unfair' applies in consumer cases [after] *Cel-Tech* [*supra,*] 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527]." One commentator has stated in reference to *Cel-Tech* that "[t]he California Supreme Court has apparently decided to leave for another day, or leave for the appellate courts, the task of formulating a definition of 'unfair' in consumer cases." (Stern, Bus. & Prof. C. § 17200 Practice (The Rutter Group 2003) ¶ 3:119, p. 3-28.) In *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 851 [128 Cal.Rptr.2d 389] (*Gregory*), a post-*Cel-Tech* decision, the Court of Appeal recently stated that "[t]he term unfair is not precisely defined in the statute, and the courts have struggled to come up with a workable definition."

Referring to the term "unfair" as used in the UCL, the California Supreme Court in *Cel-Tech* stated that "[a] few Courts of Appeal have attempted a definition. (E.g., *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164] ['[A]n "unfair" business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.']; *State Farm Fire & Casualty Co. v. Superior Court* 1996 45 Cal.App.4th 1093, 1104 [53 Cal.Rptr.2d 229] [' "the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim" '].)" (*Cel-Tech, supra,* 20 Cal.4th at p. 184.)

In *Cel-Tech*, which in part involved an action under the UCL by sellers of cellular telephones against a direct competitor that allegedly sold such

telephones below cost to gain subscribers for its cellular service, the Supreme Court adopted a new "test" for determining whether a business practice or act is "unfair" within the meaning of the UCL: "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes [Business and Professions Code] section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech, supra,* 20 Cal.4th at p. 187, fn. omitted.) In a footnote, however the high court held that this new definition does not apply to consumer cases, stating in part: "This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as 'fraudulent' or 'unlawful' business practices or 'unfair, deceptive, untrue or misleading advertising.' " (*Id.* at p. 187, fn. 12.)

Nevertheless, some post-*Cel-Tech* state appellate decisions have held that the new *Cel-Tech* test applies even to consumer cases. In *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144 [93 Cal.Rptr.2d 439], which involved a class action brought by a car renter under the UCL against a car rental corporation, the Court of Appeal noted that "[t]he *Cel-Tech* court required 'that any finding of unfairness to competitors under [Business and Professions Code] section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition[]' [citation]" (*Schnall, supra,* 78 Cal.App.4th at p. 1166, fn. omitted), and stated that the *Schnall* plaintiff's UCL claim, "unlike that in *Cel-Tech*, does not pertain to unfair competition between direct competitors. Nonetheless, accepting the suggestion of *Cel-Tech* that *any* claims of unfairness under the UCL should be defined in connection with a legislatively declared policy, we find such a test satisfied in this case." (*Schnall, supra,* at p. 1166.)

In *Gregory, supra,* 104 Cal.App.4th at page 854, the Court of Appeal apparently agreed with the *Schnall* court, stating that "*Cel-Tech* . . . may signal a narrower interpretation of the prohibition of unfair acts or practices in *all* unfair competition actions . . . ." (Second italics added.) The *Gregory* court also stated that "where a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." (*Gregory, supra,* at p. 854.)

We need not decide which test or definition of the term "unfair" applies in the instant case. We conclude that, regardless of which applies, Bernardo failed to substantiate her claim that Planned Parenthood's Web site speech

constituted an "unfair" business practice or act within the meaning of the UCL. Bernardo points to no legislative policy, or to any public policy "tethered" to any specific constitutional, statutory or regulatory provision, which was allegedly offended or violated by Planned Parenthood's speech. In her reply brief, Bernardo continues to argue that she has "detailed a long list of specific *factual* representations [by Planned Parenthood] that are *false*." (Italics added.) For reasons already discussed, we have rejected Bernardo's contention that Planned Parenthood's Web site statements concerning the claimed ABC link were "factual representations" because her own evidence shows that those statements were expressions of *opinion* regarding a disputed issue that is the subject of an ongoing scientific debate between proponents of Bernardo's view that induced abortion increases the risk of breast cancer, and proponents of Planned Parenthood's position that credible scientific evidence does not establish such a link. The court properly found that "the very fact that [Bernardo's experts] recognize and discuss the contrary opinions in their declarations shows that the issue of whether induced abortions increase the risk of breast cancer is far from being a foregone scientific conclusion."

Furthermore, the authenticated photocopies of Planned Parenthood's Web pages submitted by Bernardo show that PPFA explained to visitors of the Anti-Choice Claims Web page that there are two opposing views on the claimed ABC link. That Web page contained a review of some of the many studies of the alleged ABC link published during the past 20 years, including studies that support Bernardo's position that such a link exists, such as Brind's meta-analysis (see fn. 4, *ante*) and Daling's study published in the Journal of the National Cancer Institute (see fn. 5, *ante*). The Web page included a "Works Cited" bibliography that cited 32 published studies on the ABC link issue, including Brind's meta-analysis, Daling's study, and others works that supported Bernardo's position on the ABC link. In addition, the Web page explained the ABC link theory that Bernardo advocates: "The theory linking pregnancy termination and breast cancer is based on the hormonal disruption that occurs when a woman's pregnancy is interrupted. Pregnancy initiates a surge of sex hormones (estrogen, progesterone, and prolactin), which leads to differentiation of the cells in the breast glands in preparation for lactation. . . . Adherents of this theory claim that interruption of the first trimester of a first pregnancy causes a cessation of cell differentiation that may result in a subsequent increase in the risk of cancerous growth in these tissues."

■ The unfairness prong of Business and Professions Code section 17200 " 'has been used to enjoin *deceptive or sharp practices*. . . .' [Citation.]" (*Klein v. Earth Elements, Inc., supra,* 59 Cal.App.4th at p. 970, italics added.) Based on the foregoing evidence submitted by Bernardo regarding PPFA's statements in its Anti-Choice Claims Web page concerning the school of thought on the ABC link issue to which Bernardo subscribes and which

PPFA strenuously rejects, we conclude she failed to show that PPFA engaged in "deceptive or sharp" practices that may be enjoined under the UCL, and she failed to meet her burden of showing a reasonable probability of prevailing on her claim that Planned Parenthood's Web site speech on the ABC link issue was an "unfair" practice or act within the meaning of the UCL.

    iii.    *"Fraudulent" business practice or act*

To establish that Planned Parenthood's speech constituted a "fraudulent" business act or practice within the meaning of Business and Professions Code section 17200, Bernardo is required to " 'show that "members of the public are likely to be deceived." ' " (*Nike, supra,* 27 Cal.4th at p. 951; *Shvarts v. Budget Group, Inc., supra,* 81 Cal.App.4th at pp. 1159–1160.)

■   Here, Bernardo has not shown, and cannot show, that members of the public are likely to be deceived into procuring an abortion or any other service provided by Planned Parenthood or one of its affiliates based on the Web site speech that Bernardo seeks to enjoin. Regarding the ABC link issue, PPFA's Anti-Choice Claims Web page informed visitors that there are two schools of scientific research with opposing points of view on the issue of whether an induced abortion increases the risk of breast cancer. That Web page discussed Bernardo's point of view as well as Planned Parenthood's position and provided citations to all published studies and articles referenced therein, including those that supported Bernardo's position, thereby providing all interested visitors the means to independently view both sides of the controversy for themselves. Although Bernardo claims that Planned Parenthood's statements comparing mortality rates of abortion and childbirth were false and misleading because they did not factor in deaths resulting from the abrogation of the "protective effect" caused by termination of pregnancy via induced abortion and resulting in breast cancer deaths, Bernardo's own evidence shows that PPFA expressly acknowledged in its Anti-Choice Claims Web page that "[i]t is known that having a full-term pregnancy early in a woman's childbearing years is *protective against breast cancer*" (italics added); PPFA stated in its Choosing Abortion Web page that "abortion does not offer the same *protection against breast cancer* as a full term pregnancy" (italics added); and PPSDRC stated in its Abortion Info Web page that "abortion does not offer the *protection against breast cancer* that having several full-term pregnancies does" (italics added). We conclude that Bernardo failed to meet her burden of showing a reasonable probability of prevailing on the merits of her claims that Planned Parenthood's speech was likely to deceive members of the public and that it constituted a fraudulent business act or practice within the meaning of the UCL.

### b. *FAL*

"California's false advertising law ([Bus. & Prof. Code,] § 17500 et seq.) makes it 'unlawful for any person, . . . corporation . . . , or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state, . . . in any newspaper or other publication . . . or in any other manner or means whatever . . . any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . .' ([Bus. & Prof. Code,] § 17500.)" (*Nike, supra,* 27 Cal.4th at p. 950.)

The *Nike* court explained that "to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that "members of the public are likely to be deceived." ' [Citations.]" (*Nike, supra,* 27 Cal.4th at p. 951.)

■ We have already concluded that Bernardo failed to show a reasonable probability of prevailing on the merits of her claims that Planned Parenthood's challenged Web site speech is commercial or that its statements concerning the claimed ABC link and the safety of abortion are false, misleading or deceptive representations of fact that are actionable under Business and Professions Code sections 17200 and 17500. Were we to assume that Planned Parenthood's speech could properly be characterized as advertising actionable under Business and Professions Code section 17500, we would conclude that Bernardo failed to show a reasonable probability of prevailing on the merits of her FAL claim, because for reasons discussed, *ante,* her own evidence established she failed to meet her burden of showing a reasonable probability of prevailing on the merits of her claim that Planned Parenthood's speech was likely to deceive members of the public.

### 3. *Claim that the court improperly evaluated Bernardo's evidence*

Bernardo contends the court "engaged in an improper evaluation of [her] prima facie showing by repeatedly weighing the credibility of her experts and the comparative probative strength of competing evidence when addressing [her] claims." Bernardo also complains the court "repeatedly viewed evidence in the light least favorable to [her] claims," "rejected [her] evidence by characterizing [Planned Parenthood's] statements as education, not advertising or statements made in connection with an offer of services, and as no more than statements of opinion." Bernardo maintains that the court's "improper evaluation" of her prima facie showing produced erroneous legal

conclusions, such as the court's conclusion that Planned Parenthood's Web site statements were not unlawful, unfair, or fraudulent.

Bernardo's contentions are moot. As already discussed, we independently review the order granting Planned Parenthood's motion to strike the complaint under the anti-SLAPP statute under a de novo standard of review (*Kajima Engineering & Construction, Inc. v. City of Los Angeles, supra,* 95 Cal.App.4th at p. 929). We thus independently decide whether the granting of that motion was correct, but we need not decide whether the court's reasoning in granting that motion was proper.

For reasons already discussed, we have concluded that Bernardo's own evidence in opposition to Planned Parenthood's anti-SLAPP motion to strike shows that she did not, and could not, state and substantiate a legally sufficient claim under either the UCL or FAL, and thus she failed to demonstrate a probability of prevailing as required by section 425.16(b)(1) and case law interpreting that subdivision. (See *Navellier, supra,* 29 Cal.4th at p. 88.) Accordingly, we need not, and do not, address the specifics of Bernardo's contention that the court improperly evaluated her prima facie showing.

### 4.    *Claim that application of section 425.16 violated Bernardo's constitutional rights*

Last, Bernardo contends that "if the [court's] application of [section 425.16] is correct, then the statute violates [her] First Amendment and Due Process rights." Bernardo apparently maintains that the court's granting of Planned Parenthood's motion to strike her complaint under the anti-SLAPP statute violated her First Amendment right to petition the government for redress of grievances by filing her lawsuit under the UCL and FAL. Bernardo also asserts that due process is a "concept which voids laws that are vague or overbroad as well as those that deprive citizens of their rights without adequate notice," and complains that the court "employed a standard that could never be predicted in advance—one that essentially required [her] to predict with certainty the way in which the Court would view her evidence and the way in which the Court would resolve questions of fact and law." Specifically, she maintains that section 425.16 violates her due process rights because "the 'reasonable probability of success on the merits' standard is meaningless in practice," and she complains that she "has been barred from the courts of [California] based on a standard that, if properly applied in this case, bars all litigants but those that can predict the future."

We reject Bernardo's contention that application of the anti-SLAPP statute violated her First Amendment rights. The California Supreme Court has

explained that " '[t]he right to petition is not absolute, providing little or no protection for baseless litigation' [citation]." (*Equilon, supra,* 29 Cal.4th at p. 64.) Here, Bernardo does not dispute that Planned Parenthood met its threshold burden under section 425.16(b)(1) of showing that Bernardo's claims against Planned Parenthood for injunctive relief under the UCL and FAL arose from protected activity. The court properly took judicial notice of the fact that abortion is one of the most controversial political issues in our nation. Because Bernardo's complaint challenged Planned Parenthood's Web site speech concerning the claimed ABC link and the risks involved in abortion procedures, as Planned Parenthood argued in its motion papers, Planned Parenthood met its burden of showing that Bernardo's suit arose from "written . . . statement[s] . . . made in a place open to the public or a public forum in connection with an issue of public interest" within the meaning of section 425.16, subdivision (e)(3) discussed, *ante.* For reasons already discussed, Bernardo failed to meet her burden under section 425.16(b)(1) of stating and substantiating a legally sufficient claim (see *Navellier, supra,* 29 Cal.4th at pp. 88–89). By properly finding that Bernardo's lawsuit was a SLAPP and dismissing it under section 425.16, the court did not interfere with her First Amendment free speech or petitioning rights. The California Supreme Court has explained that the anti-SLAPP statute "subjects to potential dismissal only those causes of action as to which the plaintiff is unable to show a probability of prevailing on the merits (§ 425.16, subd. (b)), a provision we have read as 'requiring the court to determine only if the plaintiff has stated and substantiated a legally sufficient claim' [citation]. So construed, 'section 425.16 provides an efficient means of dispatching, early on in a lawsuit, [and discouraging, insofar as fees may be shifted,] a plaintiff's *meritless* claims.' [Citation.]" (*Equilon, supra,* 29 Cal.4th at p. 63 [124 Cal.Rptr.2d 507, 52 P.3d 685], italics added.) The anti-SLAPP statute did not prevent Bernardo from bringing a meritorious claim; it properly prevented her from continuing to prosecute her meritless SLAPP suit. The application of section 425.16 in this matter did not violate Bernardo's First Amendment rights.

█ We also reject Bernardo's contention that the "reasonable probability of success on the merits" standard under section 425.16 is both meaningless and a violation of her right to due process. As already discussed, the California Supreme Court has explained that in order to establish the requisite probability of prevailing required by section 425.16(b)(1),[16] a plaintiff "need only have ' "stated and substantiated a legally sufficient claim." ' [Citation.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.]" (*Navellier, supra,* 29 Cal.4th at pp. 88–89.) This

---

[16] The text of section 425.16(b)(1) is set forth in footnote 11, *ante.*

standard is sufficient for due process purposes to put a plaintiff like Bernardo on adequate notice as to the burden that must be met under section 425.16(b)(1) to defeat a motion to strike brought under the anti-SLAPP statute.

In sum, the gravamen of Bernardo's action against Planned Parenthood was (1) her unsubstantiated assertion that the ABC link is an established scientific fact, and (2) her unsubstantiated claim that Planned Parenthood published on its Web sites commercial speech consisting of false and misleading statements of fact about the safety of abortion, the safety of abortion vis-à-vis childbirth, and the scientific and medical literature that Bernardo believes has established the existence of the ABC link that should be enjoined under the UCL and FAL and replaced by speech to be published on Planned Parenthood's own Web sites, pursuant to a mandatory injunction, that would have expressed her view that the claimed ABC link is an established scientific fact.

We hold that the dismissal of Bernardo's action under the anti-SLAPP statute was proper on the ground she failed to meet her statutory burden under section 425.16 of showing a reasonable probability of prevailing on the merits of her claims for injunctive relief because (1) her own evidence demonstrated that Planned Parenthood's statements about the claimed ABC link were noncommercial expressions of opinion about an issue of genuine scientific debate that were fully protected under the First Amendment and thus not actionable under either the UCL or FAL; (2) her challenge to Planned Parenthood's statements regarding the safety of abortion failed as a matter of law because this challenge was based on the unsubstantiated premise that the claimed ABC link is an established scientific fact; and (3) she failed to show a reasonable probability of prevailing on the merits of her claims that Planned Parenthood's speech, assuming it consisted of commercial statements of fact, was unlawful, unfair or fraudulent within the meaning of the UCL or constituted false advertising within the meaning of the FAL. We also hold that the dismissal of her action under the anti-SLAPP statute did not violate her First Amendment or due process rights.

Because the claimed link between abortion and breast cancer is a public health issue about which scientific researchers and public health advocates in good faith have disagreed, the proper resolution of this appeal requires application of the fundamental public speech principle enunciated by the United States Supreme Court that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an *opinion* may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339–340 [41 L.Ed.2d 789, 94 S.Ct. 2997], italics added, fn. omitted.) Here, Planned Parenthood's Web site speech interpreting, evaluating and discussing the content and weight of the scientific literature addressing the claimed ABC

link represents the kind of rigorous debate on issues of public concern that the First Amendment was designed to promote and protect.

## II.

### BERNARDO'S APPEAL FROM THE MANDATORY ATTORNEY FEES AWARD UNDER SECTION 425.16(c)

Bernardo separately appeals the court's order awarding attorney fees to Planned Parenthood in the amount of $77,835.25 under the mandatory fees provision set forth in section 425.16(c).[17] Bernardo contends that section 425.16(c) is unconstitutional on its face and as applied, asserting the attorney fees award levied against her is a penalty that violates her constitutional right to (1) petition the government for redress of grievances and access the courts by filing litigation; (2) due process; and (3) equal protection. We reject these contentions.

### A. *Standard of Review*

"The interpretation of a statute and the determination of its constitutionality are questions of law. In such cases, appellate courts apply a de novo standard of review. [Citation.]" (*People v. Health Laboratories of North America, Inc.* (2001) 87 Cal.App.4th 442, 445 [104 Cal.Rptr.2d 618] (*Health Laboratories*).)

### B. *Analysis*

#### 1. *First Amendment and right to petition*

Claiming that the mandatory award of attorney fees levied against her under section 425.16(c) is a "fine" and a "draconian penalty," and asserting that "[t]he State of California cannot penalize litigants for bringing suits regarded as unlikely to succeed," Bernardo contends that section 425.16 violates her First Amendment rights to petition and access the courts because it imposes a penalty and "liability for fees" without requiring a showing that the suit is objectively frivolous. In support of this contention, Bernardo cites several United States Supreme Court and California Supreme Court decisions for the proposition that, as a general First Amendment principle, the law

---

[17] Section 425.16(c) provides: "In any action subject to subdivision (b), *a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs.* If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5." (Italics added.)

cannot impose penalties or tort liability for filing a lawsuit absent a showingthat the suit is objectively groundless.[18]

Bernardo's arguments are based on the unsupported premise that the anti-SLAPP statute's fee shifting provisions "penalize" or impose "liability" on plaintiffs whose complaints are dismissed under section 425.16. In *Equilon, supra,* 29 Cal.4th 53, the California Supreme Court held that a defendant moving to strike a cause of action under section 425.16 on the ground it is a SLAPP need not show that the plaintiff brought the action with the subjective intent of chilling the defendant's exercise of constitutionally protected speech or petitioning activity. (*Equilon, supra,* 29 Cal.4th at pp. 57, 68.) In arguing that an intent-to-chill proof requirement was a constitutionally compelled element of the anti-SLAPP statutory scheme, the plaintiff in *Equilon* asserted that the First Amendment generally bars "liability" for filing lawsuits that are not "shams." (*Equilon, supra,* at p. 62.) Noting that "[h]undreds of California statutes provide for an award of attorney fees to the prevailing party [citations]" (*Equilon, supra,* 29 Cal.4th at p. 62), the *Equilon* court rejected that argument and stated that fee shifting under section 425.16(c) "does not make a party 'liable' for filing a lawsuit, but rather simply requires the party that creates the costs to bear them." (*Equilon, supra,* at p. 62.) The high court also rejected the argument that the anti-SLAPP statute's fee-shifting provisions unconstitutionally "punish" plaintiffs, explaining that "[p]laintiffs as well as defendants may recover fees: defendants . . . only when the plaintiff burdens free speech with an unsubstantiated claim [citation]; plaintiffs whenever a defendant's motion to strike is 'frivolous or is solely intended to cause unnecessary delay' (§ 425.16(c))." (*Equilon, supra,* 29 Cal.4th at p. 63.)

The Supreme Court's reasoning in *Equilon* is equally applicable here. By providing for a mandatory award of attorney fees in favor of a defendant who prevails on a motion to strike under the anti-SLAPP statute, section 425.16(c) does not punish, penalize, or impose "liability" on the SLAPP plaintiff. The fee shifting simply requires the plaintiff, as the party whose SLAPP suit caused the defendant to incur attorney fees and other costs, to bear those fees and costs. (*Equilon, supra,* 29 Cal.4th at p. 62.) In this regard, Bernardo correctly acknowledges in her appellant's opening brief that the fee award under section 425.16(c) "is designed to *compensate* defendants for the cost of defending the suit . . . ." (Italics added.)

---

[18] Bernardo cites, for example, *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* (1993) 508 U.S. 49, 60–61 [123 L.Ed.2d 611, 113 S.Ct. 1920]; *Bill Johnson's Restaurants, Inc. v. NLRB* (1983) 461 U.S. 731, 741 [76 L.Ed.2d 277, 103 S.Ct. 2161]; *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1169 [232 Cal.Rptr. 567, 728 P.2d 1202]; and *Pacific Gas and Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118 [270 Cal.Rptr. 1, 791 P.2d 587].

Our conclusion that the court's award of attorney fees in favor of Planned Parenthood under section 425.16(c) did not violate Bernardo's constitutional right to petition the government for redress of grievances is also compelled by this court's decision in *Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174 [118 Cal.Rptr.2d 330] (*Schroeder*). In *Schroeder*, the plaintiff, a taxpayer, sued a city, its city council and several city council members, seeking injunctive relief and a declaration that the city's program to increase voter registration was an illegal expenditure of public funds. (*Id.* at p. 179.) The defendants moved to dismiss the action under the anti-SLAPP statute. The trial court granted the motion, finding that the plaintiff had failed to show a reasonable probability of success on the merits, and awarded attorney fees to the defendants as the prevailing parties under section 425.16(c). (*Schroeder, supra,* 97 Cal.App.4th at p. 179.) On appeal, the plaintiff challenged the dismissal of the lawsuit and also challenged the attorney fee award on the grounds that a mandatory attorney fee award against a taxpayer who has challenged a governmental program would unconstitutionally infringe upon his or her right to petition the government for redress of grievances. (*Id.* at p. 193.) We rejected the plaintiff's constitutional challenge to the fee award, and held that "[t]he right to petition for redress of grievances includes the right to sue [citation] private as well as governmental entities. [Citation.] However, 'the right to petition has never been absolute' [citation] and 'baseless litigation is not immunized by the First Amendment right to petition.' [Citation.] . . . [C]onstitutional rights to petition have been subjected to reasonable restrictions to prevent abuse of the right, and narrowly drawn restrictions on that right can be valid. " (*Schroeder, supra,* at p. 195.)

In *Schroeder*, we recognized that "the government is injured by meritless suits, that the right to petition does not provide an absolute immunity to citizens who bring meritless suits, and the Legislature may by statute grant governments the ability to recoup their attorney fees. . . .[T]he right to petition may be subject to legislatively imposed conditions and restrictions, provided the restrictions are narrowly drawn to achieve a substantial governmental interest that is content neutral and unrelated to the suppression of the exercise of First Amendment rights. . . . [T]he Legislature may provide for an award of attorney fees to governmental entities for defending against frivolous lawsuits without impermissibly infringing on the right of petition for redress of grievances." (*Schroeder, supra,* 97 Cal.App.4th at p. 196.) We concluded that the mandatory attorney fee provision set forth in section 425.16(c) "is valid because it seeks to achieve a substantial governmental interest that is content neutral and unrelated to the suppression of the exercise of First Amendment rights and is narrowly tailored to achieve that interest. There is a substantial governmental interest in deterring unmeritorious lawsuits generally, and that interest assumes greater weight in the arena governed by section 425.16[(c)]:

unmeritorious lawsuits that can chill the defendant's exercise of First Amendment rights. Although [plaintiff] argues that the statute is designed to suppress protected activity—his right to sue the government—we conclude the statute is primarily designed to *promote and encourage* protected conduct—the right of defendants to exercise their First Amendment rights without fear of unmeritorious SLAPP lawsuits." (*Schroeder, supra,* 97 Cal.App.4th at p. 196, original italics.) We further held that the attorney fee clause of section 425.16 passes constitutional muster because it "applies to all unmeritorious lawsuits premised on acts taken in furtherance of the defendant's constitutional rights of petition or free speech, regardless of the point of view espoused by the plaintiff. It applies only to that narrow category of lawsuits . . . that are premised on acts taken in furtherance of the defendant's rights of speech, and leaves untouched any other type of lawsuit. . . . Finally, it is closely tailored to achieve these substantial governmental interests because it has no application to most lawsuits . . . but instead applies only to lawsuits in which two narrow conditions are satisfied: first, the court must be satisfied that the lawsuit seeks recovery for acts taken in furtherance of the defendant's rights of free speech or petition; and second, the lawsuit must be so lacking in merit that, even when the evidence is viewed most favorably to the plaintiff, the plaintiff cannot prevail as a matter of law." (*Schroeder, supra,* at p. 197.)

### 2. *Due Process*

Bernardo also claims that section 425.16(c) violated her due process rights in two ways. First, she repeats her contentions that "the 'reasonable probability of success on the merits' language is unconstitutionally vague," this standard is "meaningless in practice," and "[t]he net result of the standard imposed by [section 425.16] is to require [her] to predict the inherently unpredictable under pain of *penalty* in the form of attorney fees." (Italics added.) For the reasons discussed, *ante*, we have already concluded that the "reasonable probability of success on the merits" standard codified in section 425.16(b)(1) (see fn. 11, *ante*), as interpreted by the California Supreme Court (see *Navellier, supra,* 29 Cal.4th at pp. 88–89), is not unconstitutionally vague and thus the court's application of that standard in this matter did not violate Bernardo's right to due process. As already discussed, the Supreme Court has held that the section 425.16(c) fee-shifting provision that Bernardo challenges here does not unconstitutionally "punish" plaintiffs whose SLAPP causes of action are subject to dismissal for failure to show a probability of prevailing on the merits. (*Equilon, supra,* 29 Cal.4th at p. 63.) The fee shifting under section 425.16(c) "simply requires the party that creates the costs to bear them." (*Equilon, supra,* 29 Cal.4th at p. 62.)

Second, Bernardo contends the mandatory fee-shifting provision of section 425.16(c) violates due process because it does not require a showing of fault, such as a reckless disregard for the truth, supported by a heightened evidentiary standard, such as clear and convincing evidence, that she claims is required to impose "damages," "liability," a "fine," or a "draconian penalty" in the form of a fee award for activity that involves the exercise of fundamental First Amendment rights, such as the right to pursue litigation. As already discussed, however, the California Supreme Court has held that " '[t]he right to petition is not absolute, providing little or no protection for baseless litigation' [citation]." (*Equilon, supra,* 29 Cal.4th at p. 64.) Bernardo's contention is based on the unsupported premise that she had a fundamental First Amendment right to bring a SLAPP against Planned Parenthood. Bernardo has cited no authority, and we are aware of none, that supports her implied assumption that a litigant has a fundamental constitutionally protected right to file a SLAPP suit.

### 3. *Equal Protection*

Last, Bernardo contends that the mandatory fee-shifting provision of section 425.16(c) violates her right to equal protection of the law because it "creates an unconstitutional penalty" and imposes fee liability for "the exercise of First Amendment rights that discriminates between parties based on the nature of their First Amendment activity and the nature of the plaintiff." Specifically, Bernardo maintains that (1) the "statutory language and purpose" indicate that section 425.16(c) and its attorney fees provision are designed to "favor a defendant's First Amendment rights to speech over a plaintiff's First Amendment right to petition and access courts"; and (2) section 425.16, subdivision (d) (hereafter section 425.16(d), discussed, *post*) "creates impermissible classifications based upon the identity of the plaintiff as either a public or private attorney general." We reject these contentions.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike. [Citation.]" (*Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 439 [87 L.Ed.2d 313, 105 S.Ct. 3249].)

"Although most statutes differentiate somehow between classes of people, the equal protection clause does not forbid classifications. [Citation.] So long as the classification is not arbitrary but is based on some difference in the classes having a substantial relation to a legitimate object to be accomplished, Legislatures may make reasonable classifications of persons, businesses and

activities. [Citation.] [¶] The equal protection clause of the California Constitution similarly states that a person 'may not be denied equal protection of laws' (Cal. Const., art. I, § 7), and statutory classifications challenged thereunder are analyzed by the same rules applicable to challenges to the Fourteenth Amendment. [Citations.]" (*Health Laboratories, supra,* 87 Cal.App.4th at pp. 447–448.)

The *Health Laboratories* court further explained that "[l]egislative classifications are presumed valid and will be sustained if the classification is rationally related to a legitimate state interest. Most statutes challenged on equal protection grounds are tested by this rational basis standard. [Citation.] Only when the classification jeopardizes the exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic is the statute subject to the heightened review employed in strict scrutiny test. [Citation.] To pass constitutional muster in that case, such statutes must be suitably tailored to serve a compelling state interest. [Citation.] For purposes of the strict scrutiny test, a fundamental right means a fundamental constitutional right. [Citation.]" (*Health Laboratories, supra,* 87 Cal.App.4th at p. 448.)

As already discussed, the California Supreme Court has held that the mandatory section 425.16(c) fee-shifting provision does not unconstitutionally "punish" or impose "liability" on plaintiffs whose SLAPP causes of action are subject to dismissal for failure to show a probability of prevailing on the merits. (*Equilon, supra,* 29 Cal.4th at p. 63.)

Bernardo complains that section 425.16(c) "provides differing liability for fees based upon the nature of petitioning activity" because under that subdivision a plaintiff is liable for mandatory fees without any showing of fault if the defendant prevails, but a defendant is liable for fees only upon a showing that the defendant's motion to strike is frivolous or solely intended to cause delay. Bernardo asserts that the court's award of attorney fees in favor of Planned Parenthood in this matter violated her right to equal protection because the result of the application of the section 425.16(c) mandatory fee provision is "to punish the plaintiff's exercise of the fundamental right to petition the courts by creating a cost not born[e] by opponents in litigation," and "the statute, in effect, makes the courts available to different parties, on different terms, depending upon the nature of their petitioning activity."

These assertions are unavailing. There is no fundamental First Amendment right to petition the courts by filing a SLAPP. As already discussed, the California Supreme Court has explained that " '[t]he right to petition is not

absolute, providing little or no protection for baseless litigation' [citation]."
(*Equilon, supra,* 29 Cal.4th at p. 64.) Furthermore, the mandatory fee-shifting
provision of section 425.16(c) does not bar Bernardo or any other plaintiff
from bringing a meritorious claim. Contrary to Bernardo's assertion, section
425.16(c) does not make the courts "available to different parties, on different
terms, depending upon the nature of their petitioning activity."

We also reject Bernardo's contention that the anti-SLAPP statute unconsti-
tutionally discriminates against her by refusing her the "immunity" accorded
to public prosecutors under section 425.16(d), which provides: "This section
shall not apply to any enforcement action brought in the name of the people
of the State of California by the Attorney General, district attorney, or city
attorney, acting as a *public prosecutor*." (Italics added.)

Bernardo claims that she brought this action for injunctive relief against
Planned Parenthood on behalf of the public, without seeking any personal
gain, and the effect of section 425.16(d) "is to create a discrimination against
private parties advancing the public interest that is inimical" to her constitu-
tionally protected right to equal protection of the law.

This claim is unavailing. In *Health Laboratories, supra,* 87 Cal.App.4th at
page 451, the Court of Appeal held that the provision of the anti-SLAPP
statute exempting public prosecutors from its strictures does not violate the
equal protection clauses (U.S. Const., 14th Amend., § 1; Cal. Const., art. I,
§ 7). The *Health Laboratories* court noted that "SLAPP suits are typically
characterized as suits brought not to vindicate a legal right but to interfere
with the defendant's ability to pursue his or her interest. [Citation.] SLAPP
plaintiffs do not care so much about winning their lawsuits as they care about
delaying and distracting the defendant from his or her objective, which is
generally economically adverse to those of the SLAPP plaintiff. SLAPP
plaintiffs achieve their goal if their suits deplete the defendant's resources and
energy. [Citations.] The legislative history of section 425.16 plainly implies
that its purpose was to prevent the harm caused by such plaintiffs." (*Health
Laboratories, supra,* 87 Cal.App.4th at p. 450.)

The *Health Laboratories* court also noted that, "[b]y contrast, a public
prosecutor's enforcement action is not motivated by a retaliatory attempt to
gain a personal advantage over a defendant . . . . *The prosecutor's motive
derives from the constitutional mandate to assure that the laws of the state
are uniformly enforced and to prosecute any violation of these laws, so that*

*order is preserved and the public interest protected.* [Citations.]" (*Health Laboratories, supra,* 87 Cal.App.4th at p. 450, italics added.) The court explained that "[n]othing in the legislative history of section 425.16 implies that the problem the Legislature sought to rectify thereby was created by prosecutors bringing meritless enforcement actions. The state may properly limit a regulation to the class of persons as to whom it thinks the need for regulation is more crucial or imperative. [Citation.] [¶] To enable prosecutors to perform their constitutional duties thoroughly and effectively, laws have been enacted to insulate them from actions that would hinder or deter their enforcement actions. . . . [¶] The exclusion of public prosecutors from the anti-SLAPP motion procedure is consistent with the rationale of these immunity statutes. Subjecting them to such a procedure could unduly hinder and undermine their efforts to protect the health and safety of the citizenry at large by delaying an enforcement action. Not only would prosecutors have to respond to the motion at the trial level, they could become ensnared in an appeal, insofar as the grant or denial of a SLAPP motion is immediately appealable. (§ 425.16, subd. (j).) False advertising enforcement actions could be particularly susceptible to delay by the moving manufacturer's easy assertion that the prosecutor's action interfered with its commercial free speech rights." (*Id.* at pp. 450–451.)

■ A *private* plaintiff bringing suit under the UCL or FAL allegedly on behalf of the public is not similarly situated to a public prosecutor because the private litigant's motive, unlike that of a public prosecutor, does not derive "from the constitutional mandate to assure that the laws of the state are uniformly enforced and to prosecute any violation of these laws, so that order is preserved and the public interest protected" (*Health Laboratories, supra,* 87 Cal.App.4th at p. 450). We conclude that the classification created by section 425.16(d)'s exemption of public prosecutors' enforcement actions from anti-SLAPP motions does not jeopardize the exercise of a fundamental right or categorize litigants on the basis of an inherently suspect characteristic; it is rationally related to the state's legitimate interest in allowing public prosecutors who did not create the SLAPP problem to pursue actions to enforce laws, unencumbered by delay, intimidation, or distraction; and thus it does not violate the equal protection clause of either the United States or California Constitution.

## DISPOSITION

The orders are affirmed. Planned Parenthood shall recover its costs and attorney fees on appeal. (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785 [54 Cal.Rptr.2d 830]; *Dowling, supra*, 85 Cal.App.4th at p. 1434.) The cause is remanded to the trial court for a determination of the amount of reasonable attorney fees and costs Planned Parenthood shall recover from Bernardo under the provisions of section 425.16(c).

McIntyre, J., and O'Rourke, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 14, 2004.